Case No. 25-2239, Alignment Healthcare Inc. Appellants v. United States Department of Health and Human Services Appellant, Mr. Kimberly for the appellants, Mr. Starr for the appellants. Good morning, counsel. Mr. Kimberly, please proceed when you're ready. Good morning. Thank you, Your Honor. Appellant alignment in this case does not ask the court to break any new legal ground. The rule on which this case depends is straightforward. If an agency alone has access to relevant evidence or data, and a regulated entity raises a facially plausible, credible objection in an administrative review process, asserting that the data are wrong or contain or reflect errors, the agency must actually look at the data. This follows from Fox Television, among other cases. Fox Television tells us that courts must, quote, insist that an agency examine the relevant data and articulate a satisfactory explanation, close quote, based on that data. If an agency doesn't check the data, and it later turns out in an APA lawsuit in which the agency produces the data that it refused to review in the administrative review process, that the objection is borne out by that data, then the agency has violated the APA. And we know that from State Farm. Courts must reject, quote, an explanation for an agency decision that runs counter to the evidence before the agency. Fox Television and State Farm are two of the most clearly established foundational ad-law cases on the books, and they are sufficient, we submit, to resolve this case. Now the explanations that CMS gives to the court now on appeal differ entirely from the explanations that it gave to alignment in the administrative review process. In the administrative review process, it said the response rates that reflected Spanish language engagement sort of fell within the normal range, and therefore we're not going to investigate any further. Explanation one. Explanation two. And in any event, we don't get involved in disputes between MA plans and survey vendors because we don't control survey vendors, our private third-party contractors. Before this court, the agency doesn't defend either of those positions. Instead, it offers two new ones, one of which wasn't even adopted by the district court. Its first explanation is to say that the question of how to administer the CAHPS survey in Spanish to individuals known to prefer Spanish is a question of absolute discretion for the third-party delegate, the survey vendor. And although the survey vendor may elect to take into consideration the preferences and directions and requests of the MA plans, they need not. It's entirely their discretion. Sort of a subset of that argument is that all the survey administrator then must do is ensure that Spanish language surveys are made available within the meaning of the protocols and specifications, and that's done simply by sending a pre-notification letter with instructions in Spanish on how to request Spanish surveys. Its second argument, and that was adopted by the district court at JA-81, its second argument is to say that the survey administrator in this case, in any event, did follow alignments instructions, but it did so after electing to use a especially, quote-unquote, conservative record-matching protocol that virtually ensured that a substantial portion of the individuals identified by alignment as preferring Spanish would not actually receive surveys in Spanish. Now, the clearest, I think, answer for this court as to those two explanations is simply that they weren't made in the administrative review process. And there are few rules more basic than that judicial review of agency action is limited to the reasons that the agency gives when it took its action, and that post hoc litigation rationales are not a basis for upholding an agency action. But even on their own terms, those arguments don't hold water. We know from the protocols and specifications themselves that survey administrators must follow the protocols and specifications. A clear example of that, JA-148. We know, too, that the protocols and specifications state that survey, that MA plans. Oh, I'm sorry to interrupt. Just one second. We've lost the connection to Catsys. All right. Why don't we just take a brief recess to see if we can remake the connection.  And if we can get it, we'll pick up where we left off and give you a little time. Great. Back up a little bit. This honorable court is again in session. Be seated, please. Okay, I think we're back connected now. So you had made the point that you thought that the two brief rationales in the briefs weren't reflecting the agency decision, and then you were going on to address the merits of them in any event. Correct. So I'll start with the first explanation, Your Honor, which is that survey administrators have discretion to determine how they choose to administer CAHPS surveys to individuals known to prefer Spanish with Spanish language materials. We know from the protocols themselves that the protocols are binding on survey vendors at JA-148. We know from JA-167 to 168 that the protocols allow for MA plans to request of their survey administrators that they be administered to individuals who speak Spanish in particular ways. It says, and I quote, survey vendors may do any of the following at the request of the contract, including send a Spanish language questionnaire only in all mailings of the survey to enrollees known to prefer Spanish according to language preference data received from the contract. That is what happened here. Now, CMS's position is that because the protocols use the word may, permissive may rather than mandatory shall, it indicates that the survey administrator is free to disregard the request of an MA plan. But that can't be right for one of either two or both reasons. The first is the consistency rule, and the second is the non-delegation rule. The consistency rule, which we briefed extensively in both the opening and the reply, relies on, for example, CONED against FERC, which is the idea that agency protocols obviously have to be applied consistently across regulated entities, and deviations in similar cases have to be explained with some relevant difference between the cases. And here there is no relevant distinction other than in CMS's view, the happenstance of which survey administrator an MA plan elects to hire. On CMS's view, one survey administrator could choose to always follow the requests of MA plans, another survey administrator could refuse ever to follow those requests, and a third might pick something in between. So that's a straightforward, I think, violation of the consistency principle. I mean, I think that under everybody's view, you have to win on the other argument anyway, right? Which is, in other words, even if the government's position in this case is wrong on may, they've still got the fallback position that regardless the agency didn't violate the protocols. Well, yes and no. They've made that argument, Your Honor. I would say no, we don't have to win on the merits of that argument because, once again, that is- You got the argument that that wasn't the agency's rationale to begin with. Exactly. And, you know, this is not our effort to play gotcha with the administrative record. If they had, if the agency had taken this position, which is basically alignment, you must prove a negative. If you have proved that your survey administrator didn't do anything that it possibly could have to administer the survey in Spanish to Spanish speakers, we would have requested that the agency put evidence in the record to address each of the alternatives. We don't have-alignment doesn't have control over this evidence. It's all in the hands of either DATA Stat, the survey administrator, or CMS. Much of it alignment isn't even permitted to see. And we would have explained why they were wrong and made the agency explain why it is changing its policy because its policy always has been that survey administrators must follow-its practice, excuse me, has been that survey administrators must follow the requests of the MA plans who retain them to administer the CAHPS survey. This is reflected, among other places, in the briefing in this case, JA-28, where in briefing before the district court, CMS itself said that MA plans, quote, may promote participation among non-English speaking members by providing the member with enrollee level language preference data, which is what alignment did in this case, and instructing the vendor to send translated surveys based on those preferences, which, again, is exactly what alignment did. Now, the point is in response, DATA Stat then exercised additional administrative discretion in engaging in what it characterized in emails between itself and another third-party contractor, not CMS, as an especially conservative data matching protocol. But that runs into the same problems because there's no question that this especially conservative approach to data matching substantially affected the number of individuals known to prefer Spanish who actually received materials in Spanish rather than English. It significantly depressed it by 10%. And it runs into the same consistency in non-delegation problems. What the Supreme Court said just a few months ago in consumers' research is third-party contractors, I want to make sure this isn't another connection problem, okay, third-party contractors to agencies that help agencies administer the regulatory programs under their supervision must do so according to detailed rules, and they must at all times be subject to supervision and control by the agency, which is what the agency in the administrative review process in this case expressly disavowed. It said we have no control over these third-party contractors, and they are free to do as they like with respect to these questions of administrative discretion. So, really, no matter how you cut it, there is no way we submit to justify the outcome in this case in a way that's consistent with settled ad law principles and the Constitution and its limit on non-delegation. Let me make sure my colleagues don't have any additional questions for you at this point. And we will give you a little time for rebuttal. Okay. None for me. Thank you. Mr. Starcher. Your Honors, and may it please the Court, Jack Starcher on behalf of the United States. The district court here correctly granted summary judgment in CMS's favor based on two independent rationales. Those rationales are the same basic rationales given in briefing before the district court and that the agency provided in its decision below. And those two rationales are straightforward. The first is that the protocol that is the focus of this litigation and was the focus of alignments complaints before the agency is by its terms optional, not mandatory. Hence, even if that protocol were not followed, that would not demonstrate a violation of any mandatory CMS protocol sufficient to cast significant doubt or significant enough doubt on the results of the survey in question. And second, and these are, again, independent, in any event, the record before the agency demonstrated that this optional protocol was followed. And I'll just, I think it's helpful to look at what that protocol actually says. And this is JA-168. So, again, this is even accepting the opening argument that the may in this section actually is a must. The protocol says that the vendor can send a Spanish language questionnaire only to enrollees that, quote, can be identified using one option, language preference data received from the contract. And there is no dispute that the vendor used language preference data received from the contract to send Spanish language only surveys to individuals identified using that information. In briefing before this court, the focus is particularly in the reply brief. I guess it's really only in the reply brief. The plaintiff didn't mention this at all in their opening brief. The focus is on the adequacy of this, of the explanation given by the vendor at JA-198 for why some individuals identified as preferring Spanish might not have or did not receive Spanish language only surveys notwithstanding that data. But once we're at that point, we're so far beyond anything in the protocols that I just don't see any way that CMS could have been required to throw out the entirety of these survey results as a result of these errors. I do just want to briefly respond to this suggestion that any of this is new or that there was any sort of invention of new arguments that were not made by the agency in this months-long email exchange that appears in the joint appendix. And I guess I'd just point to the very first email that CMS sent in response to plaintiff's concerns, and that's JA-127. And there is a full paragraph in that initial response explaining to plaintiff exactly the point that is made in our briefing and exactly the point that the district accepted, which is CMS protocols in this space are extensive. There are optional requirements and there are mandatory, I'm sorry, there are optional features in the protocols and there are mandatory features in the protocols. And in that full paragraph, again, the very first response CMS sent, CMS responded and explained that CMS requires that, and this is a quote, that at a minimum, Spanish surveys be made available upon request from members in response to the bilingual pre-notification materials. That's the mandatory requirement. And in the very next sentence, CMS says, please see page 50 of the protocols, which is the page we've been talking about so far, for details about actions, plans, and survey vendors may employ to promote or further promote participation in Spanish. And so this was presented in the very first email CMS sent. It was never disputed. And the discussion between CMS and plaintiff proceeded on the assumption, which was supported by everything plaintiff said, that they were focused on this optional requirement. And CMS, you know, I think did more than it needed to and took those concerns very seriously. And over the course of the following, you know, month or so, several weeks, CMS responded in repeated detail with why it didn't think there were any concerns, even with that optional protocol. At that point, was it the fact that the may means that there was complete discretion wasn't something that the agency indicated in the back and forth? So I guess the response to that, I would point to JA-117, which is, again, the agency explaining, quote, whether or not Spanish-speaking members received surveys in English despite their preferences is outside of CMS control. That is a response explaining that, you know, precisely because these are optional, CMS doesn't get in, quote, doesn't get involved in how survey vendors implement language preference data. Again, I don't think you need to accept the may must thing because even if plaintiffs are right that this is best read as a must, the agency then squarely asked the vendor, did you use this data? And the vendor responded, yes, we did. Here's how. And then CMS told alignment exactly that, and it told it twice. On JA-112, quote, as we noted, the survey vendor has attested that they followed the protocol procedures and used the preference data shared by you, the plan. And then again on page JA-107, sort of in its final statement on the matter, CMS said, regarding your third issue, our analysis have established that the sample is representative, that the vendor, quote, used the language preference information you provided, and then that there was nothing else about the data that independently gave any concern to the agency. So I'm happy to answer any questions, but I do think the agency has been consistent. These same basic principles have been presented at every stage of this litigation, and if we are right as to either of them, the grant for summary judgment should be affirmed. I just have one question, which is that this is on your primary argument, and I totally understand that even if we reject the primary argument, you still got the fallback argument. People have a good understanding of that framework. But on the primary argument, to say that the may is discretionary, whether you agree with that or not, why does that matter if, in fact, the contractor then does, like, accepts it? They didn't take up the invitation not to. They actually did it. And so if that's true, then why does it even matter that it's discretionary? So it doesn't, I guess, but again, my reading of the agency's response to plaintiff during these many, many emails is that there were really these two threads, and one of the threads was there is, and I think this is just an important background for this entire dispute. CMS has extensive protocols in this space and requires vendors to follow those protocols. Specifically in the area of Spanish language access, even within that subspace, there are mandatory protocols and optional protocols all designed to make sure that Spanish language surveys are meaningfully accessible. And so I think this entire dispute sort of gets off on a strange foot, that the premise of plaintiff's argument, particularly in district court, was there was a clear violation of the protocols here, and the piece of this that we're talking about is optional. But I agree with you that the record here clearly demonstrates that the vendor did use the data. They exercised the option. In other words, maybe they had the option, if your argument is right, not to exercise the option, and it just seems to me that then you're kind of necessarily at the last argument. As to which you may well, you know, you might prevail, but it's just that I don't know that the first argument does independent work in a situation in which the options exercise. Sure. I don't disagree with that. Okay. Yeah. And if there are no further questions, again, I guess that you are affirmed. I think Judge Rodgers is saying something, Judge Rodgers, but I think you may be muted. Yes, my apologies. So how does it work in the real world? I'm an advantage, Medicare advantage insurer, and I contract with a vendor to notify, within the jurisdictions I serve, Spanish people, Spanish-speaking people, and whatever information I have about what their preferences may be. The vendor says, thank you very much. I'll take that into account. And then the vendor sends to the Spanish-speaking residents, inhabitants, a letter that says, basically, if you want to respond in Spanish, call this number. And that is in English. So, no, the pre-notification letter is required, and this is in the protocols, to be printed in Spanish on one side and in English on one side, explaining. All hypothetical. Okay. This is all English. I see. So in that case, there would be a violation of mandatory CMS protocols. That vendor would have fallen below the minimum required by the protocols. I'll also say that vendor would be in violation independently of something called the Quality Assurance Plan. There's only one page of this in the JA. That's okay. I think I understand what you're saying. So now the vendor sends a letter that is English on one side and Spanish on the other. But what they both say to the Spanish-speaking person is, if you want to take the survey in Spanish, call this number. So that is, I think, what is required by the protocols for this pre-notification letter. I'll add that there are other sort of aspects of this system I didn't know. What I'm getting at is, why doesn't the vendor necessarily take the least expensive option, which is my second hypothetical? So, again, I would point to the letter in English and Spanish. But it requires the recipient to take another step. And certainly there are all kinds of human studies that show that if you want a response to something, don't ask somebody to take another step. Because they're busy, they don't want to do it, they've got other things on their mind. So from the insurer's point of view, that makes no sense because it is going to suffer. So the question in the real world is, can an insurer dictate to a vendor that the vendor will only be paid by the insurance company if it sends the survey itself in Spanish to the people identified by the insurer as Spanish-speaking? So I guess two responses. First, and this is the same exact response that the agency gave below, to the extent a vendor and an insurance company want to enter into a contract that conditions payment on doing XYZ, I'm not aware of any control or insight or check or sort of review that CMS would do. So I think an insurance company probably would do what? CMS doesn't review, as best I'm aware, the contracts between the vendor and the insurance company that's contracting with the vendor to conduct the survey. The part of this that CMS does have control over, and I will just point you back to JA191, and this isn't really mentioned in the briefing in passing, but it's not really an issue, so it's not a focus in the briefing, but CMS, before any vendor is allowed to be a vendor that does this, you're sort of sending out of these surveys, the vendor has to enter into a quality assurance plan that is approved by CMS. Data stats, again, just one page of data stats, quality assurance plan is at page of JA191. And so I guess to go back to your question about the hypothetical sort of vendor who's taking the cheapest option or sort of cutting corners, that's exactly what this quality assurance plan is designed to prevent. The vendor represents and commits to CMS that it will take certain steps in order to ensure that the survey is administered in a way that will produce reliable data. And the page that you see on JA191 is data stat committing for these two contracts to. So if the insurance company sees a 15% drop or a 10% drop or combine those two, 25% drop, and thinks what's happened here based on previous experience, based on his information about the response rate of Spanish-speaking residents, and he calls or contacts CMS, as I understand CMS's position is that's a matter between the insurance company and the contractor. We don't get involved. So again, I guess this goes back to the Chief Judge's question a little bit. I guess that's not our only position, our position that is in any event CMS did in fact contact the vendor in this case to confirm that it did in fact follow this protocol. The vendor, of course, said he followed. I mean, what vendor is going to say I didn't follow the protocols and I didn't follow the contract? I mean, we're dealing with human nature here and human behavior. And what I'm trying to understand is to what extent CMS is just not concerned about these matters, and maybe it isn't. And that's the way it's going to administer the program. I guess my response to that is threefold. The record reflects the quality assurance plan, which shows that CMS is concerned with how these vendors operate and ensuring that they are following these mandatory protocols. As discussed in our brief, this is point two, the protocols include a lot of mandatory requirements. And again, we're in a really small universe of how does CMS make sure Spanish language surveys are meaningfully made available. Even in that small universe of this survey operation, there are, as enumerated in our briefing, a lot of mandatory requirements. You know, the website must, when you open the web survey, give you the option to proceed in your language of choice, and one of those must be Spanish. The bilingual pre-notification letter must be sent. There's more. And then I guess the third response is the lengthy email exchange between CMS and plaintiff did not begin and end with, well, you've identified an optional, not a mandatory requirement, we're done. CMS then went on to, A, confirm that the vendor did, in fact, do this, and looked at the data to make sure that there wasn't some reason to be suspicious that there was something wrong. But did not look at the underlying data that indicated the 25% drop. I mean, that's what I'm trying to understand here. I understand, I think, CMS's position about this is between the insurance company and the vendor. But asking the vendor, did you violate the law, and expecting the vendor to say anything other than, no, I did not. You know, it's an assurance, I suppose, if in subsequent administrative proceedings or litigation, the agency is dealing with the vendor. But I just want to be clear about what the insurance company's options are here, and there really aren't any. As I understand it. It doesn't have access to the data, the underlying data. That's correct. Whereas CMS does. And a 25% drop isn't enough to look at that data. That's all I'm getting at. Sure, and just to tease that out, the reference to drops in response rates from the 2024 to 2025 survey, CMS took those, and that's slightly distinct. A plaintiff, I think, probably thinks that the use of the data and the drop in response rates are the same thing. But on the drop in response rates, the agency squarely responded to that. The agency said, here's the – the agency is the one that, as you say, gave plaintiffs the data on this. And the agency looked at response rates and concluded, and I think this is an incredibly strong response, we looked at response rates for Spanish-language speakers for these two contracts in particular. And for these contracts, Spanish-language response rates were higher than average across all similar sort of surveys that are done for these contracts. What I'm getting at is, is the petitioner here incorrect in stating that CMS never looked at the underlying data? What they mean by that is they never looked at the way in which the vendor was doing the matching, the name matching. Right. Is it wrong about that? I guess the record doesn't reflect whether the agency, in fact, did that, but no. I mean, they're not wrong about that. There's no indication I could find that the agency did that. No, that's right. Okay. But there was no – My only point is, suppose when you look at the data, here we have a 25 percent drop. Suppose it's 50 percent. Suppose it's 75 percent. And the agency's response is, you know, we didn't look at the data, but we asked the vendor, and this is not so abnormal that we need to do anything more. I just want to understand how this system works, that's all. Sure. I mean, I can't say what the agency would say in that hypothetical, but I can give yes. I mean, as we point out, this is all optional. I think sort of LODESTAR underlying this entire process, if you look at 42 CFR 422.164, that's the regulatory provision explaining that CMS will always review all of the data that feeds into the STAR rating process and, quote, review the quality of the data on which the ratings are based, including accuracy, reliability, and validity of measures. So if there's ever a problem with survey vendors' actions that rise to the level of giving CMS doubts about the reliability of that data, then that is something that the agency can and will respond to. And, again, I think to the extent your question is getting at sort of a, well, did the agency here just sort of shrug and say, well, there's nothing to see here, there's, you know, what is it, 30-something pages of the JA here, which is an extensive over-a-month-long back-and-forth in which the agency absolutely did not do that. It repeatedly responded and explained what it was thinking, what it had looked at. I know, but the only thing it didn't do, says Petitioner, is look at the data that would have supported its concern about what was happening here. I don't need to pursue this. I understand your answer. Thank you. If there are no further questions, I'll sit down. Thank you, counsel. Mr. Kimberly, we'll give you two minutes for rebuttal. Thank you. Your Honors, I'll start at JA-127. Mr. Sarcher is correct that their CMS said there are optional ways of making Spanish language materials available to Spanish speakers, but it then says that alignment didn't avail itself of that option. The premise of this response, which was a factual misimpression, was legally that it's up to alignment to elect whether or not to make Spanish-only materials available to individuals known to prefer Spanish, and it said you didn't do that. Alignment responded and said, actually, yes, we did. We sent this data to Datastat, and we asked Datastat to match it in just this way, and that's when their real explanation came, which is at JA-112 and JA-117. At JA-112, they say, well, we looked at the results, and the results are within the range of normal. But alignment works really hard at this stuff. They take these surveys very seriously. Star ratings are tremendously important to the Medicare Advantage Program, and they push for administration procedures that drive up response rates because they know Spanish speakers respond more favorably for them. So they want to drive up those rates, and they take steps to do it. So no surprise that their rates overall are above average. The point is at JA-120 to JA-121, our data is showing that although the number of individuals who were sampled and known to speak Spanish went up, the rate of respondents went down. And so when CMS responded and said, well, we asked Datastat if they followed the protocols and specifications, our response was, yeah, I mean, okay, we get it, sort of along the lines, Judge Rogers, of your line of questioning. But when you look at the data, something's going on here. This doesn't look right. And CMS's response over pages of emails was constantly to stiff-arm alignment and refuse to look at the one thing that would have answered the question, whether there was a data administration error. And now, having filed a lawsuit and seen the data under an attorney's-eyes-only protective order, we see that there was an administration error. That, we submit, again, is all that we need to win this lawsuit. And the idea that CMS can simply step back and say, well, we don't have any control over this third-party contractor, is just not consistent either with the consistency rule requiring it to treat similarly situated regulated entities the same way, and it's also inconsistent with the non-delegation doctrine. And we submit, Your Honors, that the district court's decision should be reversed. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Katsas; Rogers